Let me welcome you to our court. At the outset, Judge Hull and I wanted to welcome to our court and introduce to you our visiting judge, Judge Susan Weber Wright, who has sat with great distinction on the district court in the Eastern District of Arkansas for many years. She was appointed by President Bush and received her commission in 1990. She served as chief judge on that court in 1998 until 2005. She has sat with us before. We are delighted to have her help us with our work, and we did want to welcome her to our court again. Two other brief observations for you before we begin. For those of you who have not appeared in our court before, you will notice that we have a green light, which means you may proceed, an amber light, which is a two-minute warning, and a red light, which says that your time is up. When you see that red light come on, we would be much appreciative if you could bring your remarks to a conclusion. Last observation, as you proceed with your argument this morning, you can safely assume that we've had the opportunity to review the briefs, the record excerpts. In some instances, we've had a chance to review the record as well. Feel free to go really to the heart of your argument. With that, we will begin with the first case, Scott Davis v. Eric Sellers. Good morning. May it please the Court. I'm Paul Kish. I represent Scott Davis. We have issues about due process, lost destruction of evidence, some weird issues involving a second tape recording. But I want to take 30 seconds and tell the Court what this case looks like to me. I got in late. I am very respectful of the fact that there was a full trial with competent counsel, a direct appeal, four days of jury deliberation, a six-day state habeas hearing. The district court noted that she sat on the case and considered it for 18 months because she was so concerned about it, yet all of those courts ruled against Mr. Davis. I am very respectful of that process. I got in the case. I read everything. And when I turned over the last page of the transcript, I thought, that's it? Now this is not a sufficiency of the evidence argument, but my point is this is a close case. This was far from a slam dunk. So the errors, it seems to us, can be magnified. So we've got these substantive due process issues and there's questions about whether they were exhausted. Here's how they were litigated. At trial, counsel made a big deal, obviously, about how ten years after the fact so much evidence had been lost. The record speaks for itself as to what was lost and apparently how it was lost. It was litigated on direct appeal and in the district court, in the state habeas, it was litigated as well. Document 68 in our record, pages 11 through 12, are the pages where the district judge, the federal district judge, Judge Totenberg, noted all the places where prior habeas counsel had brought up the substantive due process issues about the loss and destruction of evidence. It was brought up before, during, and after the state habeas. It was brought up before in a pleading. It was brought up during, during arguments. It was brought up after when prior habeas counsel submitted a proposed order that had it as a standalone issue. We submit it's exhausted. Now let's get to the guts of it. Trombetta, Youngblood are our standards. What this court has to decide is, were the state courts, whether it's the Georgia Supreme Court or the state habeas court, whoever it was, were they, the deference that we owe to them, did they engage in an unreasonable application of the Trombetta-Youngblood standard? It would be the Supreme Court of the state, would it not, since there is a resolution of this question by them? Well, it would, except the state didn't make that argument ever in the lower court. But be that as it may, whether it's the Georgia Supreme Court or the state habeas court, we owe deference to their ruling. I concede that 100%. The bigger question is, was there a reasonable application of that standard? I submit, I have never, Mr. Malcolm has never, and this court will never see an evidentiary rebuttal. So they had the right standard. They knew what the law was, but they simply unreasonably applied it to this set of facts. Exactly. Just like this court. Tell me why. There has never been a case with this much evidence lost by this many people, by five law enforcement agencies, with a custodian of record first asserting, then denying that she signed an affidavit that was prepared for her by the district attorney's office. There will never be a case of this sort. That's why we quoted twice Justice Stevens' concurrence in Youngblood, where he said, you were enunciating the standard that there is going to be a case down the road where the defendant cannot flat out prove the absolute exculpatory nature of the destroyed and lost evidence, also cannot prove that some officer engaged in bad faith, yet that defendant will not get a fair trial. We submit that's what happened here. I agree it's an unusual case. We haven't found a case that's similar. The state hasn't found one either because this is, I think it's sui generis is the Latin phrase. There will never be one like this. Again, I am very respectful that we owe deference to the state courts, that under the AEDPA, we have to basically affirm what the state courts do unless they engage in an unreasonable application. But I think the way Congress created the AEDPA, as well as the way the courts have interpreted it, it's not so strict and rigid. Help me with this. The Georgia Supreme Court, when it addresses the issue directly, says the following when basically looking at whether it's exculpatory, how powerful or significant the evidence was. They say, and I quote, other than the tassel in one of the gas cans, all of the other items were found either in the victim's burned car or home and were generally not suitable for Furthermore, any testing that was conducted on the items was preserved at trial by witness testimony. In any event, Davis has failed to show that any of the items were exculpatory and then they go on to say, moreover, there's no evidence the state acted in bad faith. So take them piece by piece. Tell me why it was so off the mark that I'm not obliged to defer to the state Supreme Court's determination that the evidence was not exculpatory, at least on its face. We don't know what the evidence was because it was lost and destroyed first. Second, there was evidence in the state habeas hearings that many of the items could have been tested. This thing that was the supposed murder weapon found next to the dead man, there's a witness who said, you could have tested that, no problem at all. Instead, the state GPI examiner who was kicked out for lying on other 13% of her results said I couldn't test it. Again, that comes back to the point, which is Justice Stevens' concurrence. There will be cases where the lost and destroyed evidence is of such a magnitude and it is so pervasive in the case that the defendant's inability . . . Your argument is I can't really show you how it's exculpatory, but they can show you that it's not. The corpus of evidence is so big that I shouldn't have to go beyond saying it's pretty much too large to bypass that way. If that was all I had, I would agree that you would owe deference, but we have more. We have the entire corpus, to use the court's word, of evidence in this case from the state habeas hearings and what else has happened concerning bad faith. Don Samuel is a friend of mine. He was the lawyer who did the direct . . . Before we get to bad faith, I just want to drill down a little bit into the question of the exculpatory character of the evidence. Was not the Supreme Court of Georgia right in saying that other than the tassel and one of the gas cans, all of the other items were burned in the car or the home and were not suitable for forensic testing, whether they maintained them or not? They were wrong about that, Judge. They were wrong in that the gas can and the, they call it the Olympic bag, found in the victim's burned Porsche were not burned. They were available. They were, for some reason, sold on the open market after the investigation was originally closed. Those were crucial because the defendant's ex-wife testified those were his gas can, his Olympic bag. There was direct evidence that those items were available. The cereal can and the gas can by itself would have been very valuable. So in that way, the Georgia Supreme Court was unfortunately dead wrong. Good faith is a component. Bad faith is an even worse component. As I was starting to say, that kind of morphs us into this issue on this second tape. And my friend Don Samuel was testifying at the state habeas hearing and he was asked about the loss and or destruction of this second tape and what would happen if the state, the state intelligence, the officer had created two tapes but had only given one to the D.A. and then got up and testified that no, there was only one tape. And Don made, said it very clear. He said, that's the quintet. That is bad faith. That's why these two issues when we look at them together. Let me ask you about that second tape. Didn't your client know about that tape at the time of his trial? He was there when they were tape recording his interview? He was there when they were tape recording an interview. He was not aware. There is no evidence that he was aware that there was a second recorder. Now, again, I'm respectful that my record is what I'm supposed to argue from. There's other evidence that's not part of the record. But there is no evidence that Mr. Davis was aware that there was a second recorder. But you would concede that if he were aware, that that would be, that would be precluded? I agree with you, Judge. I'd be in a much tougher spot if there was evidence of that. Yes, ma'am. So, we've got this second tape. And as Mr. Samuel said, that's the quintessence of bad faith. And again, this is all we're asking for. As I said, we are respectful of the fact that the federal courts aren't supposed to be creating evidence in 2254 cases. We're supposed to be assessing, as Judge Marcus mentioned, whether the state courts got it right or whether they engaged in unreasonable application of binding law. We're asking what the district judge to do is to consider sending this case back to the state court for a hearing about this second tape. We submit, again, this is very unusual. Oh, I don't know that we have the power to tell the state court what to do. Perhaps the district court could conduct a hearing on its own. But I'm not sure that we would have the power or that the district court would have the power to go back to the state court and say, we don't think you did it right. Go hold a hearing. I think that's exactly what Rines v. Weber says, Judge. It says the court actually abuses its discretion when the three standards of Rines v. Weber has been amended. I understand that a hearing might be required. The question is who conducts the hearing? Can we compel the state to conduct a hearing? No. As a sovereign and independent, you mean to say the district court ought to conduct a hearing? Or is it your view that we have the power on habeas to compel the state court to conduct a hearing? I don't think we do. If it chooses not to? I don't think, as a federal judge, you or any other federal judge can tell a state judge you must conduct a hearing. I think what a federal judge can do is to, in the words of Rines v. Weber, hold in abeyance a Federal 2254 to give the litigant the opportunity to ask the state court to conduct a hearing. If the state court chooses to do that. But Rines is really when we have exhausted claims and the one-year statute is running on them and then we have unexhausted claims, which puts the district court in a pinch were it not for Rines. But how does Rines apply here, then? I think the example of how it applies, Judge, is the Gonzalez v. Wong case quoted in our brief, I believe it's page 55, where that court, that appellate court, had something similar where they had a claim that was already maybe exhausted, not quite, and new evidence that related either to the originally exhausted claim or to a new claim came up. And they basically, the Ninth Circuit, said, you know, under pinholster, facts are supposed to be found in the state court. And they said, you know, the best thing to do is to send it to the state court for them to consider whether they'll have hearings on this. So I think that the question of whether the claim was fully or completely or partially exhausted is really not the end of it. The end of it is which court system should have the opportunity. I see your time is up currently. Thank you. Good morning. May it please the Court. My name is Clint Malcolm. I represent the appellee in this matter on behalf of the Georgia Attorney General's Office. I respectfully ask this Court to affirm the district court's denial of federal habeas corpus relief. As this Court is aware, the district court granted a certificate of appealability on two separate issues. I believe both those issues were addressed in the appellate's argument. I'll start with the lost evidence due process issue. Judge Marcus, you are correct. The Georgia Supreme Court is the state court decision we must look at. And that is the decision that should be afforded deference based on their reasonable application of Trombetta and Youngblood. Based on that decision, the state court record that the Georgia Supreme Court had on direct appeal is what must be examined. That's what Cullen v. Penholster says. So this case is a little unusual in that those issues surrounding the lost evidence were fully developed at the pre-trial hearing stage, at trial, on direct appeal, and decided adversely to appellant. And then in state habeas a few years later, those issues are sort of brought back up all through the context of Sixth Amendment and effective assistance of counsel claims. So you did have some additional evidence that appellant tried to get in through state habeas through a very lengthy evidentiary hearing. But in regards to the Georgia Supreme Court's decision on the merits, it is based on the state court record that that court had before it at the time when we're looking at HEDPA deference applied to that decision. The prongs under Trombetta and Youngblood that the Georgia Supreme Court discuss are apparent exculpatory value of the evidence that clearly was applied by the Georgia Supreme Court reasonably, as this court has already made note of. The evidence in question that was enumerated on direct appeal that counsel believed was the most noteworthy to bring to light was all either destroyed or severely damaged by fire either to the victim's porch or to the victim's house. Of course, he suggests that so much of the evidence had been destroyed in a manner that was not consonant with the normal procedures that they employ, and that sets this case apart arguably from Trombetta and cases like that. That they violated their own internal rules across the board involving multiple pieces of evidence, involving multiple agencies of the state, involving an extensive period of time, and that, he says, is different. That may be unique in that there were. That would be a fair statement, would it not? I don't disagree with that, Judge Marcus. I think there's not a dispute that certain standard operating procedures would have been law enforcement agencies either losing or discarding certain pieces of evidence in advance of a trial that hadn't occurred yet. This case was somewhat unusual also in that there was, I think, about a decade between the time of the murder and the actual trial in Fulton County. I won't go into speculation as to why that evidence may have been lost or destroyed. However, I would go back to the additional prong under Youngblood concerning bad faith, which is another element that they did not meet that the Georgia Supreme Court addressed. They had to show that law enforcement, when they lost or discarded this evidence, did so in bad faith, and they just could not meet that burden. Well, I was concerned about that the Georgia Supreme Court said there was no evidence of bad faith. I mean, there's certainly evidence of bad faith, but it's for the fact finder to determine whether it's bad faith. How is it not wrong that there's no evidence of bad faith? I mean, nobody's going to say I purposely destroyed it. You've got a very comprehensive record here of consistent violation of every procedure in the book. Sure. So, how can you say there's no evidence of bad faith, that is the Georgia Supreme Court say that, as opposed to there's evidence on both sides, we find no bad faith? I would respectfully assert that the Georgia Supreme Court was correct in that there was no bad faith in regards to the manner in which the evidence was lost or destroyed. I think when you look at the case law on bad faith . . . They didn't say there was no bad faith. They said there was no evidence of bad faith. Right. And I think when you look at the definition of bad faith, what they had to show was that there was some sort of conscious effort by these law enforcement agencies to suppress or get rid of this evidence, and that's what would constitute bad faith. And Judge Hull, I would submit to this Court, there was no evidence of that. There was certainly evidence that evidence was lost or destroyed when it shouldn't have been. But there was no evidence . . . No, but I think the point that's being raised is the inference of bad faith flows not because somebody said they did it intentionally, but because of the pervasive nature of the destruction. That's the kind of issue. Right. They don't really acknowledge that, do they, and say, but in any event, we find there's no bad faith. I think if you look at the decision, they do talk about sort of what's necessary to establish bad faith, and they enumerate the specific pieces of evidence that were raised on direct appeal. And they talk about the fact that they were lost or destroyed, and that may have been negligent, that may have been oversight, that may have been even gross negligence. But however, that is not enough to establish bad faith. So while there were multiple pieces of evidence that were lost or destroyed in advance of trial, even looking at all of that, there was still not evidence of bad faith that anybody . . . Well, take the loss of the fingerprint card in 2005. Perhaps that's the most suggestive to me. It's odd indeed the State possessed them, was testing the card in January, but no longer had them when Davis requested them later that year. I would first go to . . . Why would you destroy the fingerprint cards? I mean, it's different from something that's bulky and it's difficult to retain and you don't have room and storage is a problem and safety is a problem if you had contraband or something like that. But the fingerprint cards struck me as odd indeed. I don't have a good answer as to why that may have happened, Judge Marcus. Does the record reflect why it was that that was destroyed? Because we know as of January of 2005, the Fulton County investigator had the original fingerprints card. He was conducting further testing and they were lost by the time Davis was indicted in That's my understanding as well, Judge Marcus. As far as further details, there was some testimony from the GBI fingerprint examiner that was offered in State habeas about whether those prints were retained or lost, I should say, in violation of their standard operating procedures and whether they were APHIS quality. He could not say that they were, so that even if they had been preserved, they could have been tested. However, I would say any of that evidence in State habeas, I go back to my previous argument, it is not what has to be considered because the fingerprint issue was raised on direct appeal. However, as the Georgia Supreme Court noted, it was not preserved at the trial court level. I would like to briefly address that. That issue specifically in regards to the fingerprint card is procedurally defaulted and that is what the Georgia Supreme Court found and that was correct. The specific pieces of evidence that were addressed on the merits in the Youngblood Trombetta analysis on direct appeal, those pieces were enumerated and a merits analysis was conducted on those. Those pieces had been laid out extensively in appellant's pretrial motion to dismiss the indictment. However, the fingerprint card and other pieces of evidence were not enumerated there. They were first enumerated at the motion for new trial level and on direct appeal. There has been some mention, I think, in appellant's briefing as to a continuing objection or a motion in limine in regards to the fingerprint card or other lost items. But if you look specifically to the record in the case, you will see that that motion in limine and then once it is denied, the continuing objection was specific to four pieces of evidence. I direct the court to the record at document 16-29. This is the record before the district court, pages 19 and 50 through 52. That is the pretrial proceedings right before this case was going to trial where four pieces of evidence, I believe the two gas cans, the hat tassel and the plastic Olympic bag, those were items that trial counsel, after they had lost their motion to dismiss the indictment, those were items they specifically wanted the court to address and they asked the court to preclude the state from even mentioning anything about them in their motion in limine. That motion in limine was denied. They asked for a continuing objection to be granted as to those four specific items which did not include the fingerprint card. The court gave them a continuing objection and that issue was addressed when it came up at trial. The reference to serial numbers on gas cans, because I didn't quite understand. How do they show there was, in fact, a serial number on the gas can? I am not sure that they have, Judge Hall. Is that like a product number or I just didn't understand a quote serial number on a gas can. My understanding of that argument is just like there would possibly be a serial number on more expensive items, but my understanding of these items were they were cheap gas cans. There was one found in the victim's burned Porsche and one found on the side of Mount Perrin Road. The relevance of the gas can on the side of Mount Perrin Road was never really even established and linked to the case. The gas can inside the burned Porsche was burned, so whether or not there was a serial number on it to begin with or whether or not that serial number would have remained after it was burned was never established. From what I can tell. But my question is who testified these cans have serial numbers? I don't know that anybody did at the stage that the case was up on direct appeal. I just didn't understand that piece of the evidence that we're talking about. Maybe Mr. Kish can tell me. Yes, Your Honor. I think a lot of the arguments as to the alleged exculpatory nature of some of this evidence are purely speculative and not based on anything in the record. I think that's telling in that it shows that there is, in fact, no exculpatory value to these items. Then as I understand it on the fingerprint card, they did run a test and everybody admits his fingerprints were not a match to the fingerprint card. Is that correct? That's absolutely correct. That was established at trial. So that exculpatory nature of that evidence was before the jury. And their contention is, well, we should have run the card against the system, so to speak, to see if there were any other matches of other third parties. And then at least some witness testified these were not of the quality you could have done that. It didn't have enough data points or whatever it requires. That's essentially correct. That witness was... I'll ask Mr. Kish to make sure I understand the record in that regard. Yes, Your Honor. But that's my understanding. I'm not saying it solves it. They still lost it. Right. It's indicative of how they lost other things, but at least I don't know how it was exculpatory. And I would submit that they have never established that it was in any manner. I wanted to ask about the, not about the fingerprint cards, but about the issue concerning exhaustion of the substantive due process matters. Yes, Your Honor. I know that sometimes, and in this case it was conflated with the Strickland v. Washington issues. Yes. Do you concede that these are exhausted? The due process concerning the lost or destroyed evidence? Yes, exactly. Except for the fingerprints. Except for the fingerprints. The 12 items, I believe there were 12 that were enumerated on direct appeal. If we're talking about due process violations surrounding the State's failure to preserve those 12 items, we don't contest exhaustion. For some reason, the exhaustion issue just went off the rails at some point in the district court. I think you can attribute some of that to the manner in which the issues were raised in the federal pleadings by appellant. And the district court noted this, that it was very hard to decipher what specific constitutional claims they were raising in their federal pleadings. Not uncommon, I might add. Well, I would agree with that as well, Your Honor. It's not as common in counsel pleadings, but we argued every alternative argument we could to give them every benefit of the doubt as to the issues. So your view, just so we're clear, is the district court, in fact, erred in determining that the due process claim had been procedurally defaulted? In regards to those . . . Save for the fingerprints. In regards to those 12 pieces of evidence on direct appeal, yes, Your Honor. Let me ask you this question. Of the evidence that was destroyed, you've already started to reference this, but I want to ask it directly. Of the evidence that was destroyed, was any of it of such a nature that it would be apparently exculpatory from its face and be of such a nature that the defendant would be unable to obtain comparable evidence in some other way? No, Your Honor. I don't think any of the evidence that was destroyed, and that evidence would be . . . Tell me why not. Focused on the evidence that the Cab Fire Department took in regards to the burned vehicle. The evidence in that burned vehicle was burned and severely damaged by water. So, this isn't a Brady case where the evidence was never disclosed to appellant or his counsel. They fully knew about it and then in the interim period between the time of disclosure and the time of trial, it was . . . and that evidence in the car was destroyed. But no, Your Honor, there was no . . . He says, Mr. Kish says there was something in the car that wasn't destroyed or maybe two items in the car. Did I misapprehend that? There was a hat tassel and that was another car. That was not in the victim's burned car. That was in another . . . A bag. A bag of some kind. An Olympic plastic bag was in the burned car. It was burned. Where was the hat tassel? It was in a . . . it was found in a neighbor's car, I believe. So that evidence was lost and that is separate from the evidence that was in the victim's burned car, which was obviously burned and water damaged. That evidence . . . Help me with the firearm before you sit down. Yes, Your Honor. I didn't understand. I understand you may not have been able to match the bullet from the victim's body to the firearm because of the fire and water damage, but why wouldn't just the firearm on its face to follow up on Judge Marcus have some value to try to trace it or to . . . I guess we know it was the victim's firearm because he reported it stolen and then it's found. Right. So why is there not any other value to the firearm? Other than being right there at the victim's body, the GBI had the firearm. They attempted to do ballistic testing and they could not because it was so severely burned and damaged by water. And it's been undisputed that that's the firearm that killed him or . . . I don't know if that would be undisputed. As opposed to some other firearm? I'm not sure that that was a contention at trial that was disputed. I mean, there was no ballistic evidence to link it directly that that was the murder weapon, but it was found right there and it was the victim. So that was certainly . . . What do you mean by found right there? By the victim. Okay. It was located at the crime scene. So the ballistic nature of it could not be linked due to the damage that was caused by the fire, even though GBI had that and they tried. I see my time has expired. One last question. Was it the type of firearm that this type of bullet could have come from or do we even know that? I'm not sure we know that. Kish can tell us. Okay. Thank you. Thank you, Judge. Thank you very much. Mr. Kish, you preserve four minutes. Thank you. Let me ask you just at the outset to tell me what amongst the destroyed evidence obviously had an exculpatory value that would have been apparent before it was destroyed and would be of such nature that defendant would otherwise be unable to obtain comparable evidence. Can we tell that any of it had exculpatory value or is all we can say is there's stuff there that if preserved might have been tested and might in turn have disclosed exculpatory information? I can't tell you. It was apparently exculpatory, Judge. So it would fall into the second category. Absolutely. Okay. And the problem, it seems to me, with the State's argument is that whenever there's a case where evidence is destroyed by the crime itself, the defendant can never win. Ever. Doesn't the law require you to show more than bad faith, though? It does. Even if you can show bad faith, if you cannot otherwise establish the materiality of the evidence in some constitutional sense, that is to say its exculpatory character and the client some surrogate method of establishing it, you still lose. If this was a closer case, it's not right on habeas and a collateral attack? It is. It is correct. But as in this Court's Guzman case, the materiality analysis looks at the whole picture, and when you look at the whole picture of this case, something not right happened in this case. And that's what greatly concerns us. We're talking about the weapon that was found next to the dead man's body. The State argued at length that that was the murder weapon, but there's no evidence of that. And the reason the defense can't test that to see if it's the victim's gun, is it the defendant's gun, is it a local guy who's been known to kill people's gun, is it a gun that was stolen for, is because it's destroyed. And then coming back to Judge Marcus's point, whenever there's a case where there is destroyed evidence by the crime, the defendant can never win. That's the problem. That's why I say this case is, in many ways, sui generis. It's one of a kind. And then especially when you look into the magnitude and the nature of the . . . So is it your view that we ought to depart from the law in this habeas case, and depart from young blood and trumpetta, and hold that it's enough to establish bad faith here, and it doesn't matter that its exculpatory character was not at all evident, because of the pervasive nature of the destruction? I'm not asking the court to depart. I'm asking the court to hold that it would be an unreasonable application of the trumpetta and young blood standard, that under these facts, and in this type of crime, that the defendant . . . Do you understand why I asked the question this way? Because you've got two hurdles that you've got to navigate. I do. I understand that, Judge. I recognize that. Coming back to the testing of the gas can. There was a witness. I'm sorry, I've forgotten his name. He's at the state habeas hearing. He's an investigator. He said, yeah, gas cans, we test these things all the time. They have serial numbers, just like most products. Oh, he said they have serial numbers. Yes. Okay, that's where it comes from. Yeah. The fingerprints. True. The fingerprints are not Scott Davis's. Yay. They're also not the victim's. Yay. Whose are they? That's what you want to know, because somebody stole that Porsche and put it on fire. If it's not Scott Davis's, that would be real helpful to know whose it belongs to, because then the defense can . . . Don't we know it's not Scott Davis's? That's my point. We know it's the third person. But we are never going to know who that third person is, is the problem. How do we know that's the person that stole the Porsche? We don't. We just know their fingerprints found in the car, whether it was inside the car or on the car door. I don't know where the fingerprints were. I think they were on the car door, but I'm not entirely sure. Okay. But you are absolutely right. All a fingerprint does is it shows that somebody touched their grubby little fingers on the car door. Right. Right. But in a case of this closeness, even the smallest of inabilities to follow up on the defense . . . But it is true to run it through the system, you've got to have enough data points to do it. And they said they didn't. Is that disputed? It is. They said it wasn't of quality that you could have run these prints, because there are a lot of prints you can't run through the system. That is disputed. The witness did say that he thought that they weren't, but there was other evidence indicating that the witness, who was a man named Alfredi Pryor, I believe, the GBI latent print examiner, who said that he basically wasn't even comporting with his own standards when determining whether or not it had enough of those points of comparison to put into the system. I see that my time is up. Thank you very much.  We will move on to the . . .